IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JEFFREY T. JONES and CHARLENE VINCENT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  10-cv-3131 |
| | ) | |
| CITY of LINCOLN, a Municipal Corporation, | ) | |
| Lincoln, Illinois, | ) | |
| SHAUN PETTIT, Police Officer, City of Lincoln, | ) | |
| JASON DeVORE, Police Officer, City of Lincoln | ) | |
| and KEVIN LYNN, Police Officer, City of Lincoln, | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE TO DEFENDANTS' SHAWN PETTIT, KEITH DeVORE AND KEVIN LYNN MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiff's JEFFERY T. JONES and CHARLENE VINCENT, by and through their attorneys Michael J. Costello and Douglas A. Muck, and for their Response to Defendants' Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure Rule 56, respectfully state as follows:

**A.**
**INTRODUCTION**

The Plaintiffs Jeffery T. Jones and Charlene Vincent filed a complaint pursuant to 42 U.S.C. § 1983 on or about June 4, 2010 claiming, *inter alias*, that the Constitutional Rights under the United States Constitution were violated in Lincoln, Logan County, Illinois, on or about July 5, 2008 and August 16, 2009. In particular, the Plaintiff, Jeffery T. Jones, alleges that the Defendants Shawn Pettit, Jason DeVore, and Kevin Lynn, violated his Constitutional Rights on the color of state law when he was allegedly subjected to personal injuries, unlawful arrest, and false imprisonment following July 5, 2008 and August 16, 2009. The Plaintiff Charlene

Vincent alleges that the Defendants, Shawn Pettit, Jason DeVore, and Kevin Lynn violated her Constitutional Rights when she was subjected to personal injuries on July 5, 2008.

The Defendants Shawn Pettit, Jason DeVore, and Kevin Lynn have moved for summary judgment on the grounds of Plaintiffs' failure to demonstrate violations of their Constitutional Rights, that the Defendants are entitled to qualified immunity and the doctrine of collateral estoppel applies which demonstrate that summary judgment should be granted. The Plaintiffs' claim that their Constitutional Rights were violated, that collateral estoppel does not apply as to the Plaintiff's Jeffery T. Jones and qualified immunity does not apply as to both Plaintiffs.

## B.
## DEFENDANTS CLAIM OF UNDISPUTED MATERIAL FACTS

1.      The Plaintiffs admit the allegation of Paragraph 1.

2.      The Plaintiffs deny that Mr. Pettit was off duty as a City of Lincoln Police Officer and therefore puts the Defendants upon their strict proof, and affirmatively allege that he was acting under color of state law as a police officer on duty. City Police Officers are considered on duty 24/7. (DeVore Dep. Pg 24, L 12-15).

3-9.      The Plaintiffs admit the allegations of Paragraphs 3, 4, 5, 6, 7, 8, and 9.

10.      The Plaintiffs admit the allegations of Paragraph 10, but affirmatively allege that the recommendation of the Illinois State Police determination that no legal action be taken does not preclude the Plaintiffs § 1983 action and therefore put the Defendants upon their strict proof.

11-18.  The Plaintiffs admit the allegations of Paragraphs 11, 12, 13, 14, 15, 16, 17, and 18.

## C.
## ADDITIONAL MATERIAL FACTS
## DEPOSITION OF JEFFREY T. JONES

An affidavit of co-counsel is submitted to clarify different page numbers on Plaintiffs submission of additional documents of depositions as to Defendants submission of depositions as Exhibit 1.

1.	While standing in the parking lot after leaving the Alley-Bi tavern at the Lincoln Festival, July 5, 2008 Jones was talking to Jason Lucas. He heard footsteps and two guys were running straight at him across the parking lot. They ran straight up and the tall skinny kid shoved him, Vincent said whoa you don't want to do that and put her hands up and the kid grabbed her hand bending her fingers back so far it pulled her rings off. (Plaintiff Dep. Pgs 17-18, L 7-14, L 15-17).

2.	The guy was Shawn Pettit and he is 64 or 65 inches tall. I told him don't touch her. Jason Lucas is trying to calm everyone down. (Plaintiff's Dep. Pg 18, L 7-13).

3.	Lucas is standing between them with his back to me and Pettit reached around and shoved his shoulder again. Vincent put her hands up and said look I'm telling you, you don't want to do that and Pettit reached out and grabbed her by the throat. (Plantiff's Dep. Pg 19, L 19-24).

4.	Jones had never seen him before in his life. (Plaintiff's Dep. Pg 19, L 4-5).

5.	He reached around one more time and Vincent tried to stop him. He again grabbed her by the throat, Jones hit him one time and that was it. (Plaintiff's Dep. Pg 20, L 17-24).

6.	He had been warned multiple times to stop. (Plaintiff's Dep. Pg 20 L 3-4).

7.	Jones found out later that Pettit was an off duty Lincoln police officer but he didn't know that at the time. (Plaintiff's Dep. Pg 20, L 13-15).

8.	Pettit and two others were standing around. (Plaintiff's Dep. Pg 21 L 9-16).

9.      Jones first noticed them when they were twenty five yards away. (Plaintiff's Dep. Pg 22, L 6).

10.     Once it started Lucas told Pettit calm down. (Plaintiff's Dep. Pg 22, L 16-19).

11.     They got us apart and Pettit started yelling threats at Jones and told him Pettit's address. He said come get some, come get some. Lucas was telling him to shut up and he wouldn't stop. He kept threatening Jones. (Plaintiff's Dep. Pg 24-25, L 21-24 1-3).

12.     Lucas said to go and he left. (Plaintiff's Dep. Pg 24, L 5-9).

13.     He was shoved a couple of times. The first, Pettit reached around Lucas and poked him in the shoulder and the second time Pettit tried to shove Jones backward. (Plaintiff's Dep. Pg 24, L 10-18).

14.     Pettit tried to knock him backwards and Jones didn't go down. Lucas jumped between them instantly. (Plaintiff's Dep. Pg 25, L 6-8).

15.     Jones said he kind of punched him in his chest. (Plaintiff's Dep. Pg 25, L 21).

16.     Jones said he defiantly hit him. (Plaintiff's Dep. Pg 26, L 2).

17.     Jones was worried about his girlfriend. (Plaintiff' Dep. Pg 26, L 10).

18.     When he got to his home at the motel, three police car arrived. Officer DeVore and Officer Lynn and one or two others. (Plaintiff's Dep. Pg 27, L 16-19).

19.     Police said he was under arrested for aggravated battery and Officer Lynn said we are going to show you what happens when you "f___" with one of ours. (Plaintiff's Dep. Pg 28, L 9-11).

20.     Vincent said you can't threaten him. (Plaintiff's Dep. Pg 28, L 16).

21.     Officer DeVore was present. (Plaintiff's Dep. Pg 28, L 21).

22.     Jones was placed in the car and off to jail under arrest for aggravated battery. (Plaintiff's Dep. Pg 30, L 10-13).

23.     Jones was held in jail five days before they charged him and put bail on him. (Plaintiff's Dep. Pg 30, L 15-16).

24.     At his release and at his first Court hearing, no charges were filed against him. (Plaintiff's Dep. Pg 30, L 18-20).

25.     Officer DeVore was very professional. (Plaintiff's Dep. Pg 31, L 1).

26.     At his arrest, he was placed in hand cuffs. (Plaintiff's Dep. Pg 31, L 16).

27.     Jones made no resistance. (Plaintiff's Dep. Pg 31, L 20).

28.     The arrest was very professional. (Plaintiff's Dep. Pg 32, L 15).

29.     He was in jail without bond and when bond was put on Jones after five, days he bonded out for $2,000.00 in two hours. (Plaintiff's Dep. Pg 33, L 20-23).

30.     He, his mother, and his girlfriend spoke to the State's Attorney of Logan County and he was advised at his first appearance it would be all good. (Plaintiff's Dep. Pg 38, L 12-15).

31.     At his first appearance, they dropped all the charges and he got his bond money back without the ten percent statutory reduction. (Plaintiff's Dep. Pg 36, L 20-23).

32.     At his arrest, Officer Lynn in the background made one threat. (Plaintiff's Dep. Pg 37, L 1).

33.     After the July 4, July 5 incident, Jones stated the Lincoln Police Department showed other offenses when he was arrested with aggravated battery which charges were dropped and when he was arrested for arguing with a fellow in the park and never charged. He was charged with resisting arrest. He was found not guilty at a criminal trial. (Plaintiff's Dep. Pg 39, L 5-24).

34.     When he was arrested on the third incident of resisting arrest, they dragged Jones off the porch maced him and slammed him against a police car. They went into his house after he said you can't come in without a warrant of probable cause. (Plaintiff's Dep. Pg 43, L 1-7).

35.     On the possession of a firearm charge Ricky Hopp shot at Jones four times and he was arrested. The police told Ricky Hopp, Vincent's son, he should have killed him. This took place August 18th, 2009. (Plaintiff's Dep. Pg 44, L 18-24, Pg 47 L 3).

36.     When he came to the house, Ricky came running with a pistol and shot four times. The police recovered all the bullets. (Plaintiff's Dep. Pg 49, L 21-22).

37.     The police recovered four of the six bullets. (Plaintiff's Dep. Pg 49, L 8-9).

38.     There were witnesses to this shooting. (Plaintiff's Dep. Pg 50, L20).

39.     Jones never got out of the car. (Plaintiff's Dep. Pg 50, L 2).

40.     He left the scene. (Plaintiff's Dep. Pg 50, L 15).

41.     Jones didn't step on the property. Hopp came out shooting. (Plaintiff's Dep. Pg 51, L 4-5).

42.      Although he had an order of protection, he had been staying in the same house with Vincent and Hopp for months. (Plaintiff's Dep. Pg 51, L 9-13).

43.     Jones never had a physical altercation with Hopp. (Plaintiff's Dep. Pg 52, L 21).

44.     He has known Hopp since he was born. (Plaintiff's Dep. Pg 52, L 4).

45.      Jones went to his mom's house and the police officers arrived. (Plaintiff's Dep. Pg 53, L 8).

46.     Officer Oltmans was first on the scene. He pulled a gun and stuck it in Jones' face and told him to get on the ground. (Plaintiff's Dep. Pg 54, L 20-22).

47.     Oltmans told him that he had a gun in his face for an order of protection. (Plaintiff's Dep. Pg 54, L 1-2).

48.     Since the incident in this case, the police sit down from his house and stare at him. (Plaintiff's Dep. Pg 55, L 2-3).

49.     They drive down his alley all the time. (Plaintiff's Dep. Pg 55, L 7-8).

50.     The police searched him and said that he had bullets in his pocket. (Plaintiff's Dep. Pg 55, L 11-12).

51.     He did not have bullets in his pocket when he was searched. (Plaintiff's Dep. Pg 56, L 7-9).

52.     Jones has never owned a gun in his life. (Plaintiff's Dep. Pg 56, L 16).

53.     Jones is charged which is pending with possession of bullets. (Plaintiff's Dep. Pg 57, L 23).

54.     At the time of the shooting incident there was a valid order of protection on Jones on August 18, 2009. (Plaintiff's Dep. Pg 58, L 2).

55.     Before the shooting, Jones had lived with Ricky for months. (Plaintiff's Dep. Pg 58, L 5).

56.     Vincent is not at present his girlfriend. (Plaintiff's Dep. Pg 58, L 14).

57.     Vincent told Hopp to either drop the order of protection or move out of the house. (Plaintiff's Dep. Pg 59, L 2-4).

58.     A Lincoln police officer Blockovich talked to Hopp on the phone and told him he didn't have to let Jones come in the house. (Plaintiff's Dep. Pg 59, L 8-10).

59.     Because of the bullet incident, Jones sat in jail for six months before he bonded out at $10,000.00. (Plaintiff's Dep. Pg 59, L 12-15).

60.     Jones and Vincent went to court to get Hopp to move out. (Plaintiff's Dep. Pg 60, L 7-8).

61.     Jones got out of jail February 11 and lived in a motel because Hopp refused to leave the house. (Plaintiff's Dep. Pg 60, L 10-13).

62.     Judge evicted Hopp because this was Vincent and Jones' house. (Plaintiff's Dep. Pg 60, L 16-19).

63.     When Jones was arrested on the order of protection Officer Oltmans arrived with Officer DeVore. (Plaintiff's Dep. Pg 61, L 12-15).

64.      After they searched him and said he had bullets, they binged his head off of the trunk of the car and then charged him with criminal damage to a government vehicle. (Plaintiff's Dep. Pg 61, L 20-23).

65.     On the incident of July 5th, he spent five days in jail. (Plaintiff's Dep. Pg 62, L 15-22).

66.     He does not believe Officer Pettit had any injuries. (Plaintiff's Dep. Pg 63, L 22-23).

67.     Officer DeVore dinged his head off of the trunk. (Plaintiff's Dep. Pg 64, L 18).

68.      When he was arrested and shot at, he was handcuffed behind his back and they took the back of his head and dinged it off the trunk. (Plaintiff's Dep. Pg 65, L 1-10).

69.     Jones has a little spite between himself and the police department. (Plaintiff's Dep. Pg 73, L 21-22).

70.     As to the July 4th, 5th incident, the reason Pettit came running up to him was he assumed that he was messing with Officer Lucas. (Plaintiff's Dep. Pg 74, L 6).

71.     He has known Lucas for years and has never had a problem with Lucas ever. (Plaintiff's Dep. Pg 74, L 18-19).

72.     There was no physical contact between Jones and Lucas. (Plaintiff's Dep, Pg 76, L 4-5).

73.     Pettit was yelling at him that he was having a party and gave the address and that he would whopp your ass, Lucas told him to shut up and go on. Then he said to Jones just get in your car and go. So he got in the car and left. (Plaintiff's Dep. Pg 77, L 1-11).

74.     When the police tried to arrest him for a violation of an order of protection, there was no order of protection. (Plaintiff's Dep. Pg 78, L 16-19).

75.     Pettit was yelling about the party after the incident took place. (Plaintiff's Dep. Pg 79, L 20-21).

76.     Lucas had gotten Pettit and Jones apart. (Plaintiff's Dep. Pg 79, L 23).

### CHARLENE VINCENT

1.     Vincent is employed at the Hospital Sisters of St. Francis in Springfield and is a dietary aid for over five years. (Plaintiff's Dep. Pg 6, L 9-14).

2.     There was a festival called Heritage Days which took place on July 4th and 5th. (Plaintiff's Dep. Pg 8, L 5-10).

3.     At that time, she was with Jeff Jones. (Plaintiff's Dep. Pg 9, L 6).

4.     She has known him for 30 plus years. (Plaintiff's Dep. Pg 9, L 12).

5.     They left the festival and went to a bar called Characters. (Plaintiff's Dep. Pg 12, L 3).

6.     They then went to the Ally-Bi. (Plaintiff's Dep. Pg 13, L 23-24).

7.     Vincent was not intoxicated when she was at the Ally-Bi Bar. (Plaintiff's Dep. Pg 15, L 15-18).

8.     They left the Alley-Bi tavern about 1:30 quarter to 2. (Plaintiff's Dep. Pg 16, L13).

9.     They were walking to her car to leave. (Plaintiff's Dep. Pg 17, L 16).

10.    Lucas and Jones were standing and finishing their conversation. (Plaintiff's Dep. Pg 17, L 18-24).

11.    When they were finishing their conversation and she was just standing there, Officer Pettit came running up. (Plaintiff's Dep. Pg 17, L 1-2).

12.    She did not know Pettit. (Plaintiff's Dep. Pg 17, L7).

13.    Pettit came running up and she put her hands up and said you don't want to do that. He pushed her hands down and took her face and turned her head. Pettit got hit. (Plaintiff's Dep. Pg 18, L16-22).

14.    Pettit was running full force. (Plaintiff's Dep. Pg 18, L1).

15.    She was in front of Jones and Lucas. (Plaintiff's Dep. Pg 18, L 8-9).

16.    Vincent was a couple of steps ahead of Jones and Lucas. (Plaintiff's Dep. Pg 18, L11-12).

17.    When she said you don't want to do that when Pettit was running up, she knew he was running up to start something with Jones. (Plaintiff's Dep. Pg 19, L 10-14).

18.    People went up to Jones to test him because they know he's not going to back down. (Plaintiff's Dep. Pg 20, L 22-24).

19.    People like to start fights with him. (Plaintiff's Dep. Pg 20, L 8-9).

20.     Vincent knew Pettit was coming towards them because they were the only ones' standing in the parking lot. (Plaintiff's Dep. Pg 22, L 22-24).

21.     Vincent said you don't want to do that to Pettit because she knew he was running to start something with Jones. (Plaintiff's Dep. Pg 22, L 7-12).

22.     Pettit pushed her hands down, grabbed her face, turned her neck, and knocked her ring off her fingers, and her thumb. Pettit picked up her ring. The next thing is Pettit got hit. (Plaintiff's Dep. Pg 23, L 4-11).

23.     She didn't see who hit Pettit. (Plaintiff's Dep. Pg 23, L 15).

24.     People said Pettit hit her eye. (Plaintiff's Dep. Pg 23, L 17).

25.     Pettit and Jones were arguing. (Plaintiff's Dep. Pg 24, L 7).

26.     Lucas said you don't want to do that. They were telling Jones to meet them at the certain address. (Plaintiff's Dep. Pg 25, L 4-9).

27.     She didn't know which guy was telling Jones to meet them at the address. (Plaintiff's Dep. Pg 25, L 13).

28.     They told Jones the address three times. They wanted him to come to the house. (Plaintiff's Dep. Pg 25, L 15-18).

29.     They were trying to egg him on. (Plaintiff's Dep. Pg 23, L 9-11).

30.     They drove by a house, but there were no lights on. (Plaintiff's Dep. Pg 27, L 17).

31.     They invited Jones over. (Plaintiff's Dep. Pg 27, L 21).

32.     Jones was driving. (Plaintiff's Dep. Pg 27, L 23-24).

33.     They drove back near the Ally-Bi. (Plaintiff's Dep. Pg 28, L 16-18).

34.     After that, they went to the motel where they were staying. (Plaintiff's Dep. Pg 29, L 5-8).

35. Then the police arrived, and arrested Jones. (Plaintiff's Dep. Pg, 29, L 10).

36. Officer Lynn arrived. (Plaintiff's Dep. Pg 29, L 13).

37. He said Jones was arrested for battery to a cop and that's when they found out Pettit was a cop. (Plaintiff's Dep. Pg 30, L 2-5).

38. When Jones was arrested she was shaking. She never had someone rush her like that ever in her life. (Plaintiff's Dep. Pg 32, L1-2).

39. Jones said he hit someone. (Plaintiff's Dep. Pg 32, L 15-17).

40. It was the person that did her hands and her face. (Plaintiff's Dep. Pg 32, L 20).

41. Jones said he has the right to protect her. (Plaintiff's Dep. Pg 32, L 23-24).

42. Pettit grabbed her neck and turned her face. (Plaintiff's Dep. Pg 33, L 13).

43. She was under doctor's care for an accident she had months prior to this. (Plaintiff's Dep. Pg 33, L 20-21).

44. Pettit aggravated it. She was still on medication for her neck. (Plaintiff's Dep. Pg 34, L 17-18).

45. Vincent probably took Vicodin 24 hours after the accident. (Plaintiff's Dep. Pg 37, L 19-22).

46. She took Vicoden as needed for her pain. (Plaintiff's Dep. Pg 38, L 8-10).

47. In August of 2009, she was living with her son and Jones. (Plaintiff's Dep. Pg 38, L 22, L 3).

48. On August 18th, 2009 she was not home when shots were fired by her son. (Plaintiff's Dep. Pg 39, L 19-22).

49. On July 5th, 2009 Lynn talked to her and was an asshole to her. (Plaintiff's Dep. Pg 40, L 15, 23).

50.     After they left the Alley-Bi and returned to the motel there was a car following them. (Plaintiff's Dep. Pg 43, L 16, 2-3).

51.     They pulled into the motel and Jones asked why he was following him and the car left the scene. (Plaintiff's Dep. Pg 43, L 6-9).

52.     It was not Pettit. (Plaintiff's Dep. Pg 44, L 10-11).

53.     At some point I was aware that Hopp had an order of protection. (Plaintiff's Dep. Pg 44, L 7-9).

54.     She assumed in the parking lot that the group was egging Jones on and challenging him to a fight. (Plaintiff's Dep. Pg 50, L 1-4).

56.     Pettit was going to tackle Jones. (Plaintiff's Dep. Pg 57, L 11-12).

57.     Jones and Lucas were behind her talking. (Plaintiff's Dep. Pg 57, L 14).

58.     She heard Jones defending her. (Plaintiff's Dep. Pg 57, L 19-20).

59.     When Jones was arrested an officer said that's what you get when you mess with one of ours. (Plaintiff's Dep. Pg 64, L 8).

60.     She wanted Pettit arrested but the officer said they can't arrest him because he is a police officer. (Plaintiff's Dep. Pg 64, L 14-16).

61.     She wanted Pettit arrested for laying hands on her. (Plaintiff's Dep. Pg 64, L 22-24).

62.     Lynn stated that Jones could be arrested because he is an ex-con. (Plaintiff's Dep. Pg 65, L 4-5).

63.     Jones has been arrested several times by the Lincoln Police since July 2008. (Plaintiff's Dep. Pg 66, L 18-20 L 24).

**POLICE OFFICER KEVIN LYNN**

64.     My arrest was based on what Shawn (Pettit) had said to me. (Lynn Dep. Pg 18, L 12-14).

## POLICE OFFICER SHAWN PETTIT

65.     Pettit says hey guys lets go to my address and then he heard this deep voice yelling who we know wasn't one of his friends say I'll be there or let's do it. (Pettit Dep. Pg 16, L 12-14, L 19-21).

66.     I didn't know who this guy was (Jones), I followed him to make sure I didn't know what his intentions were. He was not going to let another officer go potentially whatever might have happened to their home. (Pettit Dep. Pg 18, L 8).

67.     He turned around to walk away and called 911. (Pettit Dep. Pg 24, L 1).


## POLICE OFFICER JASON LUCAS

68.     Pettit didn't know who Jones was and he turned and went to Jones and asked him do me a favor don't go to his party. (Lucas Dep. Pg 20, L 12-18).

69.     Jones had no problem, I'll leave him alone or I won't go or something to that affect. Lucas said thanks and was going to leave. (Lucas Dep. Pg 20, L 18-22).

70.     Pettit must had seen me talking to him and got the wrong impression and came back. (Lucas Dep. Pg 20, L 22-24).

71.     To his knowledge the case was not prosecuted against Jeff Jones. (Lucas Dep. Pg 61, L 1-3).

## POLICE OFFICER KENNETH DEVORE

72.     He was called to assist with the arrest of Jeff Jones. (DeVore Dep. Pg 13 L 23)

73.     City police officers are considered on duty 24/7. (DeVore Dep. Pg 24 L 12-15)

<u>**ANALYSIS**</u>

**SUMMARY JUDGMENT**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Id*. The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id*. at 325. Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and procedure evidence of a genuine issue for trial. *Id*. at 324. A summary judgment motion is not defeated by inferences supported solely by conjecture or speculation. *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

Summary Judgment should be denied because disputed question of fact arise to be applied to the law pertaining to whether Pettit was acting under color of state law, whether there was probable cause to arrest Jones, whether the Defendants and each of them are entitled to qualified immunity, and whether excessive force was utilized under the color of state law.

**COLOR OF STATE LAW AND SHAWN PETTIT**

An issue is whether the Defendant Shawn Pettit was operating under the color of state law. Apparently, Pettit argues that this is purely a personal dispute.

No bright line rule exists for distinguishing between personal pursuits and activities taken under color of law. *Pitchell v. Callan*, 13 F.3d 545. 548 (2nd Cir. 1994). However, the United

States Supreme Court has devised a two-part test of courts to follow in determining whether a conduct which allegedly deprived a plaintiff of a federally protected right is attributed to the state: (1) "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person from whom the State is responsible", and (2) the depriving party must be "a person who may fairly be said to be a state actor," *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

"The important consideration… in determining whether an officer is acting under color of state law is the nature of the specific acts performed." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505-06 (7th Cir. 2001). In other words, "[d]eciding whether a police officer acted under color of state law should turn largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties," *Pickrel v. City of Springfield, Illinois,* 45 F.3d 1115, 1118 (7th Cir. 1995).

Although Pettit claims he was off duty. He was at the time a police officer of the city of Lincoln. City police officers are considered on duty 24/7. (Devore Dep. Pg 24, L 12-15).

It is undisputed that this incident took place at a Heritage Festival of the City of Lincoln where many people attended. *McLellan v. City of Chigao Heights*, 61 F.3d 557 held that crowd control was a police function within the meaning of the Local Governmental Government Employees Tort Immunity Act. Additionally the Official City Code of the City of Lincoln provides in Chapter One (Policemen) 6-1-4; Performance of Duty that, *inter alia*, the several members of the police force, and it shall be their special duty to preserve order, peace and quiet, and to enforce the provisions of this code. § 6-1-13. Power of arrest and detention, ***all police

officers and policemen shall have the power to arrest with or without process all persons within the city who shall break the peace or be found violating any city code provision or any court of law of this state*** (Ex. 8). Pettit was on duty at the time of the altercation with Vincent and Jones because pursuant to 725 ILCS 5-107-2 a police officer may arrest a person when he has reasonable grounds to believe that the person is committing or has committed an offense. Which in Pettit's mind would be Jones. In addition, the city is responsible for the indemnification of Pettit if Pettit is found guilty of wrong doing. An employee can act without good faith and still have acted within the scope of his employment for the purposes of the statute requiring municipality to indemnify the employee for judgment obtained against him as a result of acts within the scope of his employment. This was despite claim that the act of shooting a handcuffed unresisting arrestee who post no threat to the officer was an act disconnected from or extraordinary in terms of the officers normal duties. *Graham v. Souk Prairie Police Commission* 915 F.2d 1085 (7th Cir. 1990). In *Bell v. City of Milwaukee*, 746 F.2d 1205, (7th Cir. 1984), a court required a Wisconsin municipality to indemnify employee who has committed intentional torts. Thus applying these principles, Pettit was acting under color of state law with power to arrest Jones.

While standing in the parking lot after leaving the Alley-Bi Tavern at the Lincoln Festival, Jones was talking to Jason Lucas a police officer. He heard footsteps and two guys were running at him across the parking lot they ran straight up and shoved him. Vincent said whoa you don't want to do that and put her hands up. Pettit grabbed her hand bending her finger back so far it pulled her rings off. (Plaintiff's Dep. Pg 17-18, L 7-14, L 15-17). Lucas was trying to calm everyone down. (Plaintiff's Dep. Pg 18, L 7-13).

Pettit reached out and grabbed Vincent by the throat. (Plaintiff's Dep. Pg 19, L 19-24).

Pettit again grabbed Vincent by the throat and Jones hit him one time. (Plaintiff's Dep. Pg 20, L 17-24).

Pettit had been warned multiple times to stop. (Plaintiff's Dep. Pg 20, L 3-4).

Pettit said come and get some and Lucas was telling him to shut up but he wouldn't stop he kept threatening Jones. (Plaintiff's Dep. Pg 24-25, L 21-24 1-3).

Jones was held in jail 5 days before they put bail on him. (Plaintiff's Dep. Pg 30, L 15-16).

No charges were filed against Jones. (Plaintiff's Dep. Pg 30, L 18-20).

Police officer Lucas said that Jones had not problem that he would leave him alone or won't go or something to that effect. (Lucas Dep. Pg 20, L 18-22).

Lucas told Jones don't go to Pettit's party. (Lucas Dep. Pg 20, L 12-18).

Lucas said Pettit must have seen Lucas talking to Jones and got the wrong impression and came back. (Lucas Dep. Pg 20, L 22-24).

Pettit followed Jones to make sure he didn't know what his intentions were. (Pettit Dep. Pg 18, L 8).

Jones was arrested for the charges of aggravated battery (two counts) for the July 5th, 2008 arrest (Attachment statement of arresting officer, Ex. 7). Apparently for two counts of aggravated battery, the Plaintiff was arrested under Illinois law pursuant to 720 ILCS 12-4, *et. seq*.  which is an aggravated battery against a police officer. This also demonstrates that Pettit was operating under the color of state law at the time of this occurrence. Pettit was rushing to aid Lucas and arrest Jones. He was out of control, was committing a battery on Vincent, and was operating under color of state law.

The Plaintiffs claim that Pettit was acting under color of state law as a police officer is a disputed question of fact and as a result summary judgment should be denied as to the issue of operating under the color of state law.

## NO PROBABLE CAUSE TO ARREST JONES

The Plaintiff, Jeffery T. Jones, argues that there was no probable cause to arrest him pertaining to the July 5th, 2008 incident and the arrest of Jones on another incident on April 18, 2009 while the Defendants claim there was probable cause to arrest.

The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment. *Mustafa v. City of Chicago,* 442 F.4d 544, 547 (7th Cir. 2006).

Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime. *See Thayer v. Chiczewski,* ___f.3d ___, ___, Nos. 10-1974 & 10-2064, 2012 WL 6621169, at *6 (th Cir. Nov. 27, 2012); *see also Michigan v. DeFillippo*, 443 U.S. 31,37 (1979); *Beck v. Ohio*, 379 U.S. 89, 91 (1964). As the term suggests, probable cause deals not with hard certainties but with probabilities. *Illinois v Gates*, 462 U.S. 213, 231 (1983); *United States v. Suarez*, 581 F.3d at 595. Yet, although it requires something more than a hunch, probable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity – the officer's belief that the arrestee was committing a crime need only be reasonable. *See Henry v. United States*, 361 U.S. 98, 102 (1959); *Fox v. Hayes* 600 F.3d 819, 833 (7th Cir. 2010). It is a practical, commonsense, nontechnical, and fluid conception that deals with "the factual and practical consideration of everyday life on which reasonable and prudent men,

not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *accord United States v Reed*, 443 F.3d 600, 603 (7th Cir. 2006). Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant. *Whren v. United States*, 517 U.S. 806, 816 (1996); *Tebbens v. Mushol,* 692 F.3d 807, 819 (7th Cir. 2012). Although the focus is on what the officer knew at the time of the arrest, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), the court must determine whether those facts and circumstances, " ' viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

Cognizant that police officers operate in the real world, often in rapidly unfolding and even chaotic circumstances, the court views the facts not " ' as an omniscient observer would perceive them but… as they would have appeared to a reasonable person in the position of the arresting officer-seeing what he saw, hearing what he heard.'" *Carmichael v Vill of Palatine Ill.*, 605 F.3d 451, 457 (7th Cir. 2010) (emphasis omitted) (quoting *Mahoney v Kesery,* 976 F.2d 1054, 1057 (7th Cir. 1992)). Usually in a § 1983 false-arrest case the jury determines whether the arrest was supported by probable cause; but if the underlying facts are undisputed, the court can make that decision on summary judgment. *Chelios,* 520 F.3d at 686; *cf. Ornelas*, 517 U.S. at 691 (appellate courts review de novo ultimate question of probable cause).

The probable-cause standard inherently allows room for reasonable mistakes, *see Brinegar,* 338 U.S. at 176, but qualified immunity affords an added layer of protection by shielding officers from "suit for damages if 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (second alteration in

original) (quoting *Anderson*, 483 U.S. at 641); *see, e.g., Fleming v. Livingston Cnty., Ill.,* 674 F.3d 874, 880 (7th Cir. 2012). Often termed "arguable probable cause," Thayer, ___ F.3d at ___, 2012 WL 6621169, at 6, qualified immunity in this context protects officers who reasonably but mistakenly believe that probable cause exists, *Hunter,* 502 U.S. at 227. Though at first blush similar, the arguable-probable-cause inquiry, *Fleming*, 674 F.3d at 880; whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a "clearly established" constitutional right, *see Hunter*, 502 U.S. at 227; *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).

The existence of probable cause or arguable probable cause depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law. *DeFillippo,* 443 U.S. at 36; *Thayer*, ___ F.3d at ___, 2012 WL 6621169, at *7.

An arrest, of course, is the archetypical "seizure" of a person under the Fourth Amendment. *California v. Hodari D.,* 499 U.S. 621, 624 (1991). A person is "seized" when his or her freedom of movement is terminated or restrained by intentionally applied physical force or submission to an assertion of authority. *Id*. at 626; *see also Bendlin v. California*, 551 U.S. 249, 254 (2007); *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989). To determine if a seizure, including an arrest, has occurred, courts engage in an objective inquiry that presupposes an innocent person. *United States v. Drayton,* 536 U.S. 194, 202 (2002); *Florida v. Bostick,* 501 U.S. 429, 437-38 (1991).

There is a question of fact as to how the incident of July 5th, occurred. Pettit reached around one more time and Vincent tried to stop him. He again grabbed her by the throat. Jones him him one time and that was it. (Plaintiff's Dep. Pg 20, L 17-24).

He had been warned multiple times to stop. (Plaintiff's Dep. Pg 20, L 3-4).

Jones' and Vincent's Constitutional Rights were violated in that being a constitutional right to be free from harm from a police officer acting under color of state law when they had committed no offense.

Jones was entitled to self defense when he struck Pettit. The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the useful force was necessary; (5) that the person threatened actually and subjectively believed danger existed that required the use of force applied; and (6) the beliefs of the person threatened were objectively reasonable. Self-defense is available as an affirmative defense to disorderly conduct. *In re: T.W. a minor v. T.W.* 381, Ill App 3d, 603, 888 N.E.2d 148, 320 IL Dec. 931 (Fourth Dist. 2008). *See Ill* 720 ILCS 5/7-1 (a).

A person may not use force to resist arrest by a known police officer, even if the arrest is unlawful. 720 ILCS 5/7 – 7 (West 2000); *People v. Williams*, 267 Ill.App.3d 82, 203 Ill.Dec. 831, 640 N.E.2d 981 (1994). An exception to this rule is made when the officer uses excessive force. *Williams*, *ibid*. Use of excessive force by a police officer invokes the arrestee's rights of self-defense. *Williams, ibid*; *People v. Bailey,* 108 Ill.App3d 392, 64 Ill.Dec. 75, 439 N.E.2d 4 (1982). A defendant has the right to protect himself against the use of excessive force to make an arrest. *People v. Lida* 190 Ill. App.3d. 540, 545-546, (1989). Pettit had reached out and grabbed Vincent by the throat. (Jones Dep. Pg 19, L 19-24). Jones was testified in striking Pettit to prevent further injury to Vincent because of the unlawful acts of Pettit. There was no probable cause to arrest Jones for two counts of aggravated battery.

**ARREST OF AUGUST 18, 2009**

Likewise, Jones was subject to false arrest and imprisonment. Jones had come to his home where Hopp lived where he was charged with a firearm violation. Hopp shot at him four times. (Plaintiff's Dep. Pg 44, L 18-24, Pg 47 L 3). There were witnesses to this shooting. (Plaintiff's Dep. Pg 50 L 20). Who apparently were not interviewed. Jones had never got out of his automobile. (Plaintiff's Dep. Pg 50 L 2) and left the scene. (Plaintiff's Dep. Pg 50, L 15). He was arrested on the order of protection pertaining to this incident, DeVore banged his head off the trunk of the car and he was charged with criminal damage to a government vehicle. (Plaintiff's Dep. Pg 61 L 21-23). Based upon the failure of the police to investigate the facts and arrest a person who was shot at four times, no reasonable person would believe there was probable cause to arrest.

Jones claims that it his constitutional rights were violated because he was subject to excessive-force which violated his constitutional rights.

Although fatal to false-arrest and false-imprisonment claims, the existence of probable cause (or arguable probable cause) to arrest does not affect their excessive-force claims, given that the reasonableness of an arrest or other seizure under the Fourth Amendment depends not only on *when* it is made but also on *how* it is made, see *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). Put differently, even when an officer has probable cause to arrest, the Fourth Amendment prohibits him from employing " ' greater force than [is] reasonably necessary to make the arrest.'" *Gonzalez,* 578 F.3d at 539 (quoting *Lester v City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)).

A claim that an officer employed excessive force in arresting a person is evaluated under the Fourth Amendment's objective-reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381

(2007); *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam); *Graham v. Connor,* 490 U.S. 386, 388, 395 (1989); *Garner*, 471 U.S. at 7-12. The reasonableness standard is incapable "of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). It requires courts to " ' balance the nature and quality of the intrusion on the individual's Fourth Amendment interests alleged to justify the intrusion.'" *Scott,* 550 U.S. at 383 (brackets omitted) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

In judging the reasonableness of any particular use of force, the courts consider factors such as the severity of the crime, whether the arrestee poses an immediate threat to the safety of the officers or others, and whether he or she is actively resisting arrest or attempting to flee and evade arrest. *Graham*, 490 U.S. at 396; *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). The reasonableness of the force used depends on the totality of the facts and circumstances known to the officer at the time the force is applied. *Garner*, 471 U.S. at 8-9 *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). It is an objective inquiry, the dispositive question being " ' whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner,'" *Padula v. Leimbach,* 656 F.3d 595, 602 (7th Cir. 2010)), irrespective of the officer's underlying intent or motivation. *See Graham*, 490 U.S. at 397; *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). In answering the question, courts remain cognizant of "the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 397. As a result, courts "give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." *Baird v. Renbarger*, 576 F.3d 640, 344 (7th Cir. 2009).

In conclusion, Jones was arrested and handcuffed and then had his head slammed into the trunk of the police car. Clearly this is excessive force in effecting an arrest. Further, there was no probable cause to arrest Jones because the police did not investigate thoroughly and did not interview the witnesses who observed Hopp shooting at Jones. Jones was the victim.

## COLLATERAL ESTOPPEL AND SUMMARY JUDGMENT UNDER THE HECK DOCTRINE

The Defendants have claimed that Jones collaterally stopped from litigating his arrest and excessive force claims pertaining to the August 18, 2009 incident. Collateral estoppel in Illinois can be invoked; however a defendant must demonstrate: (1) the issue decided in the prior adjudication is identical to the issues presented in the current case; (2) the prior adjudication does not represent a final decision on the merit; and (3) a plaintiff of the party or included in the party use prior adjudication. *Dunlap v. Nestle U.S.A. Inc.,* 431F.3d 1015, 1018 (7th Cir. 2005) (citing *Herzog v. Lexington,* 167 Ill2.d 288, 657 N. E. 2d 1026, 929-30, 212 Ill.Dec. 581 (1995). The fact that Jones plead guilty to damage to government property, does not preclude his legating that his arrest was occasioned by excessive. Nor is it precluded because Jones claims his arrest was without probable cause. Collateral estoppel does not apply to Jones to exercise his claims of a violation of his constitutional rights pertaining to the August 18, 2009 incident.

Likewise, Defendants reliance for summary judgment on *Heck* as to the claim of Jones pertaining to the August 18, 2009 criminal conviction. He entered a guilty plea to the criminal charge of government property. Under *Hect v. Humphrey*, 512 US 477, 487-49 1994 the court must consider whether the § 1983 suit implies invalidity of Jones conviction by plea. It does not contest to the damage to government property but only contests in the § 1983 action that a police

officer violated his constitutional rights by utilizing excessive force in the arrest. *Hect* does not apply and Jones is free to make claim under § 1983 for excessive force.

## QUALIFIED IMMUNITY

Finally, the defendants claim that they are not reliable because of qualified immunity.

Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (citations omitted); accord *Messerschmidt v. Millender,* 132 S. Ct. 1235, 1244 (2012). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)(quoting *Malley V Briggs*, 475 U.S. 355, 341 (1986)); *see also Anderson v. Creighton*, 483 U.S. 635, 646 (1987) ("The general rule of qualified immunity is intended to provide government officials with the ability 'reasonably to anticipate when their conduct may give rise to liability for damages.'" (brackets and citation omitted)). To overcome the defendant's invocation of qualified immunity, the plaintiffs must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was "clearly established" at the time of the official's alleged misconduct. *E.g., Al-Kidd,* 131 S. Ct. at 2080; *Chelios v. Heavener*, 520 F.3d 678,691 (7th Cir. 2008). Though once required to determine whether a violation occurred before determining whether the right was clearly

established, *see Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), courts now have discretion to grant immunity on the basis that the right was not clearly established without determining whether there was a violation in the first place, *see Pearson*, 555 U.S. at 227, *abrogating Saucier*, 533 U.S. at 200-01.

(The qualified immunity standard 'give ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley*, 475 U.S. at 341,343)); *Thayer*,___ F.3d at___, 2012 WL 6621169, at *6 (" 'Qualified immunity protects police officers who reasonably interpret an unclear statute.'" (brackets omitted) (quoting *Mustafa*, 442 F.3d at 549)). Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully. *E.g. Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008).

Qualified immunity, in effect, affords enhanced deference to officers' on-scene judgments about the level of necessary force. *See Saucier, 533 U.S. at 204-05*. This is so because, even if the plaintiffs demonstrate that excessive force was used, they must further establish that it was objectively unreasonable for the officer to believe that the force was unlawful i.e., they must demonstrate that the right to be free from the particular use of force under the relevant circumstance was "clearly established." *See e.g., al-Kidd*, 131 S. Ct. at 2080. A constitutional right is "clearly established" for qualified immunity purposes where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640; *see also United States v. Lanier*, 520 U.S. 259, 270 (1997); *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010). "In other

words, 'existing precedent must have been placed the…constitutional question beyond debate.'" *Reichle v. Howards,* 132 S. Ct. 2088, 2093 (2012) (quoting *al-Kidd*, 131 S. Ct. at 2083).

Committing substantial escalation of force in response to passive non-compliance would be incompatible with the excessive force doctrine and would likely bring more injured citizens before the courts. *Phillips v. Community Ins. Corp.,* 678 F.3d 513, 527 (7th Cir. 2012). An example of an excessive-force claim under the Fourteen Amendment, which violated under the Eighth Amendment is where a pre-detainee was thrown on his head, weakened, and unable when ordered to get out of bed and when he turned towards the officers to explain that he was too weak to get up he was shot with taser without warning which was excessive-force. *Schneiter v. Love, No.* 09C3105, 2011 WL 635582 at *7 (N.D. Ill. Feb. 10, 2011). Jones was cuffed and made no resistance.

Police officers are accorded to the ample protection to qualified immunity not as likely to violate constitutional rights without recourse nor as an excuse to turn a blind eye to the requirements of the law but to reserve the vigilance of those individuals with the obligations to protect the public in take of ambiguity. *Hunter v. Bryant* 502, 224, 228-29 (1991). Genuine issues of material fact as to whether police officer really believed that physically resisting him or inciting crowd of bystanders when an officer arrested her for obstruction officer in performance of his duties and disorderly conduct under Illinois law included summary judgment for officers in arrestees' action under § 1983 alleging that an officer arrested her without probable cause in violation of Fourth Amendment on basis of qualified immunity.

There is a dispute of facts which necessitates the denial of a summary judgment regarding qualified immunity. On summary judgment a court may not make credibility determinations, evade the evidence or decide with interference to draw from the fact; these are jobs for a

factfinder. *Anderson v. Liberty Lobby Inc.,* 477 US 242, 255, 106 S.Ct. 2505 91 L.Ed.2d 202 (1986). Specific facts the court should consider in determining when a police officer used excessive-force in effecting an arrest, in violation of the Fourth Amendment, includes a severity of the crime at issue, whether suspect proposed immediate threat to safety of officer or others, and whether suspect was actively resisting arrest or attempting to evade arrest by flight. DeVore is not entitled to qualified immunity by slamming Jones' head to the trunk of the care. None of the defendants are entitled to qualified immunity in any of the incidents because there was lack of probable cause resulting in false imprisonment of Jones and excessive-force utilized in the event of August 18, 2009.

## CHARLENE VINCENT

Charlene Vincent was the subject of a tort by Pettit resulting in an aggravation of her previous neck condition which is a claim in a § 1983 action.

## CONCULSION

Aforesaid, the Court should deny summary judgment on all claims sought by the Defendants, and grant to the Plaintiff's such other and further relief as may seem meet and proper.

Respectfully Submitted,

JEFFREY T. JONES and CHARLENE VINCENT, Plaintiffs

s/ Michael J. Costello
Michael J. Costello Bar Number 522627
Attorney for the Plaintiffs
Costello Law Office
820 South Second Street
Springfield, Illinois 62704
Telephone No.: (217) 544-5500
Fax No.: (217) 544-7500
costello.m@sbcglobal.net

s/ Douglas A. Muck

Douglas A. Muck Bar Number 3124900
Century Building, Suite 2
207 S. McLean Street
Lincoln, Illinois 62656
(217) 732-4000
mucklawoffice@aol.com

**CERTIFICATE OF COMPLIANCE**

The undersigned attorney for the Plaintiffs Jeffrey T. Jones and Charlene Vincent, in order to avoid confusion as to page limitations of the Analysis (Memorandum of Law) herein certifies that the length of the Analysis is 4, 692 words which is within the word limitation of 7,000.

s/ Michael J. Costello
Attorney for Plaintiffs

**EXHIBITS**

1. Affidavit of co-counsel.

2. Deposition of Charlene Vincent

3. Deposition of Jeffrey Jones

4. Deposition of Kevin Lynn

5. Deposition of Shawn Pettit

6. Deposition of Jason Lucas

7. Deposition of Keith DeVore

8. Sworn Statement of Arresting Officer

9. Official City Code

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that the foregoing document was served on the following by electronic filing with the Clerk of the Court using the CM/ECF system this 19th day of February 2013.

Nathaniel M. Schmitz
Torricelli & Limentato, P.C.
2504 Galen Drive Suite 101
Champaign, Illinois 61821

s/ Michael J. Costello
Michael J. Costello Bar Number 522627
Attorney for the Plaintiff
Costello Law Office
820 South Second Street
First Floor
Springfield, Illinois 62704
Telephone No.:  (217) 544-5500
Fax No.:  (217) 544-7500
costello.m@sbcglobal.com
